IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
Submitted on Briefs February 12, 2013

## MARTA VANDALL v. AURORA HEALTHCARE, LLC
## d/b/a ALLENBROOKE NURSING & REHAB

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH092539     Walter L. Evans, Chancellor**

**No. W2011-02042-SC-R3-WC - Filed April 24, 2013**

An employee fell while working for her employer and sustained a shoulder fracture. The employer contends that the injury did not arise out of her employment and was an idiopathic fall. The trial court held that the employee sustained the burden of proving that her injury arose out of her employment. We affirm the trial court's judgment.

**Tenn. Code Ann. § 50-6-225(e) (2008 & Supp. 2012) Appeal as of Right;**
**Judgment of the Chancery Court Affirmed**

JANICE M. HOLDER, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a dissenting opinion.

Alex C. Elder, Germantown, Tennessee, for the appellant, Aurora Healthcare, LLC d/b/a Allenbrooke Nursing & Rehab.

Christopher L. Taylor, Memphis, Tennessee, for the appellee, Marta Vandall.

## OPINION

### Factual and Procedural Background

At the time of trial, the plaintiff, Ms. Marta Vandall, was sixty years of age. She graduated from Hillcrest High School in Memphis and then attended Christian Brothers College for one year, where she studied marketing and economics. She later obtained her nursing degree at the Hopkinsville Community College in Kentucky.

After obtaining her nursing degree, Ms. Vandall worked in a series of nursing or nursing-related positions for a number of different employers. Although Ms. Vandall had been employed previously by Allenbrooke Nursing and Rehab ("Allenbrooke") in 2001, she began working as an "MDS [multiple data set] coordinator" for Allenbrooke in July 2009. One of Ms. Vandall's responsibilities as an MDS coordinator was to perform a full assessment at the time of a patient's admittance to determine the patient's physical, emotional, and psychological status. She then completed the multiple data set with the information she gleaned from the assessment. The completed data set was sent to State of Tennessee and federal government agencies. As the MDS coordinator, she also prepared a care plan based on the results of the patient's assessment to ensure that the patient received the necessary care.

Ms. Vandall was also required to go to the patients' rooms and obtain the patients' medical charts from Allenbrooke's three nursing stations. She testified that she usually made three or four trips per day from her office to each of the three nursing stations. Ms. Vandall fell on August 15, 2009, while walking to a nursing station on one of her regular trips. Other nurses came to assist her, and she was taken by ambulance to the emergency room of a local hospital. At the hospital, Ms. Vandall was diagnosed with a fractured right shoulder, a bruised left knee, and a bruised left great toe. Ms. Vandall filed a complaint for workers' compensation benefits in the Chancery Court for Shelby County, and a trial was held on January 31, 2011.

During her direct examination, Ms. Vandall was asked to describe the floors at Allenbrooke. Ms. Vandall testified that "[t]he floors at Allenbrooke are the same linoleum tile floors that were there in 2001. There are some chipped tiles that I noted. They buff them every day. So they're very shiny." She noticed that there was no floor maintenance crew on the day she fell. She then was asked whether she had observed substances spilled on Allenbrooke's floors, to which she responded: "There are substances spilled on that floor constantly." She stated that elderly patients sometimes spit on the floor, that urine is sometimes on the floor, and that there are medication and water spills on Allenbrooke's floors. Ms. Vandall testified that she fell close to a "med cart" just past the nurses' station where patients "come up and get their medicine at the med cart." She described some of the liquid medications given to patients as "very sticky." With respect to the August 15, 2009 fall, Ms. Vandall testified that as she passed the medicine cart near the central nurses' station "[M]y right – the ball of my right foot, I know, stuck to the floor, because I was unable to lift it to carry through with my gait. . . . And when my foot stuck, I immediately started falling forward." After she fell, she did not look to see what caused her foot to stick to the floor because she was "so dazed and in pain."

2

On cross-examination, Ms. Vandall readily conceded she could not identify the substance on the floor that caused her to fall and stated that she did not reach down to feel around on the floor. She admitted that she was not looking down at the time of her fall, so she saw nothing on the floor. She also admitted on cross-examination that "[a]nything that [she] would state was on the floor that caused [her] to fall would be strictly speculation on [her] part."

Two witnesses testified at trial on behalf of Allenbrooke. Mr. Bobby Meadows, Executive Director of Allenbrooke, testified that he was not present at the time of Ms. Vandall's fall. However, he returned to Allenbrooke when he received a telephone call informing him of the incident. At the time he arrived at Allenbrooke, Ms. Vandall was still sitting on the floor near where she had fallen. Mr. Meadows asked Ms. Vandall how she fell. Ms. Vandall did not know what caused her fall but she thought she may have tripped over her feet. Mr. Meadows testified that Ms. Vandall was wearing a pair of "Croc" shoes without socks that appeared to be too big for her feet. When Mr. Meadows mentioned to Ms. Vandall that her shoes were too big, she agreed. Mr. Meadows testified that Allenbrooke has a policy prohibiting employees from wearing Croc-type shoes and that the policy is strictly enforced. If an employee is observed wearing Croc-type shoes, he or she is sent home to change shoes. If an employee repeatedly violates the policy, Mr. Meadows testified that he would take disciplinary action.

Mr. Meadows also testified that he inspected the area where Ms. Vandall had fallen to determine if there was any visible cause for her fall. He felt the floor in the area where Ms. Vandall had fallen, and he and several Allenbrooke nurses checked the floor by placing a level on it to see if there were any irregularities. He and the nurses also visually inspected the area and determined there was nothing on the floor that might have caused Ms. Vandall's fall. Mr. Meadows contradicted Ms. Vandall's testimony concerning the distribution of medication at the "med cart" located at the nurses' station. He testified that "we do not give residents medication at the nurses['] station. We give them in their room with privacy and with dignity."

Ms. Felecia Thompson, a unit manager and supervisor at Allenbrooke, testified that she witnessed Ms. Vandall's fall as she was walking toward Ms. Vandall in the hallway. According to Ms. Thompson, Ms. Vandall "was walking towards me from another hall, and she stumbled and went down." After Ms. Vandall was transported to the hospital, Ms. Thompson inspected the area where Ms. Vandall had fallen and saw nothing on the floor that could have caused the fall. In particular, Ms. Thompson testified that she saw no liquid or any other substance on the floor. Ms. Thompson, like Mr. Meadows, testified that Allenbrooke has a policy against employees wearing Croc-type shoes because "they don't sit correct[ly] on your feet. They flop off. And they cause a hazard for you to fall."

3

Due to her shoulder injury, Ms. Vandall was not able to return to Allenbrooke for some period of time. Ms. Vandall testified that when she ultimately attempted to return to work she was informed that she had been terminated. In February 2010, Ms. Vandall was employed by a new employer, Accredo Medco Pharmacy, as a "specialty nurse." Ms. Vandall testified that she was paid approximately $62,000 per year in her new position, approximately $2000 more than she was paid in her prior position at Allenbrooke.

Ms. Vandall's treating physician was Dr. Bret Sokoloff, an orthopedic surgeon. Dr. Sokoloff testified in his deposition that Ms. Vandall's injuries were consistent with someone who had fallen. Surgery was not necessary because the X-rays indicated good alignment of the bones. Dr. Sokoloff opined that Ms. Vandall has a permanent physical impairment of 10% to the whole person based on loss of motion and weakness.

The trial court concluded that Ms. Vandall had sustained a compensable injury during the course of her employment. The trial court found that it was reasonable for Ms. Vandall not to have inspected the area surrounding her fall because she was in so much pain. The trial court also found that the number of people in the area after Ms. Vandall's fall could explain the absence of any substance on the floor during later inspections of the area.

The trial court entered a judgment in favor of Ms. Vandall, awarding benefits based upon an 18% permanent partial disability to the body as a whole as well as temporary total disability benefits, past medical expenses, future medical benefits, and discretionary expenses. Allenbrooke filed a timely notice of appeal pursuant to Tennessee Code Annotated section 50-6-225(e)(3) (2008 & Supp. 2012) and Tennessee Supreme Court Rule 51, section one. The case was referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law. Following oral argument, but before the Panel rendered its decision, the case was transferred to the full Court for review. See Tenn. Sup. Ct. R. 51, § 2.

**Analysis**

Tennessee Code Annotated section 50-6-103(a) (2008 & Supp. 2012) provides that injuries "arising out of and in the course of employment without regard to fault as a cause of the injury" are compensable under the Workers' Compensation Law. The phrase "arising out of" means the origin of the incident in terms of causation, while "in the course of" refers to time, place, and circumstance. Phillips v. A & H Const. Co., 134 S.W.3d 145, 150 (Tenn. 2004) (citing McCurry v. Container Corp. of Am., 982 S.W.2d 841, 843 (Tenn. 1998)). It is undisputed that Ms. Vandall was acting in the course of her employment at the time she fell. The dispute in this case, however, is whether Ms. Vandall's injury arose out of her

4

employment. The trial court concluded that Ms. Vandall's shoulder injury was compensable because her injury arose out of her employment.

We review issues of fact in workers' compensation cases de novo on the record of the trial court, accompanied by a presumption of correctness of the trial court's findings. Tenn. Code Ann. § 50-6-225(e)(2). A trial court's conclusions of law, however, are reviewed de novo on the record with no presumption of correctness. Seiber v. Reeves Logging, 284 S.W.3d 294, 298 (Tenn. 2009).

The mere presence of an employee at her place of employment at the time of an injury does not mean that the injury is deemed to have arisen out of the employment. Rogers v. Kroger Co., 832 S.W.2d 538, 541 (Tenn. 1992) (citing Jordan v. United Methodist Urban Ministries, 740 S.W.2d 411, 412 (Tenn. 1987)). Instead, the phrase "arising out of" requires a causal connection between the resulting injury and employment conditions. Wait v. Travelers Indem. Co. of Ill., 240 S.W.3d 220, 227 (Tenn. 2007). If reasonable doubt exists as to whether an injury arose out of employment, it is to be resolved in favor of the employee. Phillips, 134 S.W.3d at 150. However, the plaintiff in a workers' compensation case has the burden of proving every element of the case by a preponderance of the evidence. Tindall v. Waring Park Ass'n, 725 S.W.2d 935, 937 (Tenn. 1987).

Allenbrooke argues that Ms. Vandall has failed to carry her burden of proving the required causal connection between the employment conditions and the injuries she sustained as a result of her fall. In particular, Allenbrooke contends that Ms. Vandall's injuries resulted from an idiopathic fall and not from any hazard incident to her employment. An "idiopathic fall" occurs "when the fall is caused by a condition of unknown origin." Dickerson v. Invista Sarl, No. E2006-02144-WC-R3-WC, 2007 WL 4973735, at *2 (Tenn. Workers' Comp. Panel Oct. 18, 2007).

In Wilhelm v. Krogers, 235 S.W.3d 122 (Tenn. 2007), this Court summarized the principles governing idiopathic falls or conditions. In that case, we reiterated that workers' compensation benefits are usually not awarded when the employee's injury is due to an idiopathic condition and not a "'special hazard' of the employment." Wilhelm, 235 S.W.3d at 128 (quoting Sudduth v. Williams, 517 S.W.2d 520, 523 (Tenn. 1974)). An idiopathic injury will be compensable, however, "if an employment hazard causes or exacerbates the injur[y]." Wilhelm, 235 S.W.3d at 128 (quoting Phillips v. A & H Constr. Co., 134 S.W.3d 145, 148 (Tenn. 2004)). A causal link must exist between the employment and the injury for the incident to be considered as arising out of employment. Wilhelm, 235 S.W.3d at 128. Our courts have repeatedly held that an injury that occurs while walking is not compensable unless an employment hazard, such as a puddle of water, exists and causes the injury. Wilhelm, 235 S.W.3d at 128-29 (citing Williams v. Metro. Gov't of Nashville & Davidson

5

Cnty., No. M2002-03038-WC-R3-CV, 2004 WL 370296, at *4 (Tenn. Workers' Comp. Panel March 1, 2004)).

Turning to the facts of this case, we must determine whether the evidence preponderates against the trial court's finding that Ms. Vandall proved that an employment hazard caused her fall. Ms. Vandall testified that she had previously observed substances such as spit, urine, and spilled medications on Allenbrooke's floors. Ms. Vandall also stated that certain medications could make the floor "sticky" when spilled. In describing her fall, Ms. Vandall stated that the ball of her right foot "stuck" and that her inability to lift her foot interrupted her gait, causing her to fall forward. She further stated that she knew that something on the floor caused her to fall. Although Ms. Vandall conceded that it was "speculation" as to what, if any, substance was on the floor, the trial court accredited Ms. Vandall's testimony that the fall had occurred as she described and concluded that the hazard was incident to Ms. Vandall's employment.

When credibility and weight to be given to testimony are involved, considerable deference is given to the trial court because the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. Madden v. Holland Grp. of Tenn., Inc., 277 S.W.3d 896, 898 & 900 (Tenn. 2009). Although Allenbrooke's witnesses testified that they carefully inspected the area where Ms. Vandall had fallen and found no substance on the floor or any irregularity in the floor that might have caused her to fall, the trial court concluded that the nursing staff could have tracked away whatever substance was present on the floor. We must give deference to the trial court's determination of credibility. The public policy of our Workers' Compensation Law requires us to resolve any doubts or conflicts in favor of the employee. See Curtis v. Hamilton Block Co., 466 S.W.2d 220, 222 (Tenn. 1971); see also Phillips, 134 S.W.3d at 150. We conclude that the evidence does not preponderate against the trial court's conclusion that Ms. Vandall sustained a compensable injury arising out of her employment.

**Conclusion**

We affirm the judgment of the trial court. The costs are taxed to Aurora Healthcare, LLC, and its surety, for which execution shall issue, if necessary.

_____
JANICE M. HOLDER, JUSTICE

6